UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JESSICA LEE SANFORD,

    Plaintiff,        Case No. 2:17-cv-00118

v.              HON. TIMOTHY P. GREELEY

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.
_____/

# OPINION

    In December of 2013, plaintiff Jessica Lee Sanford filed an application for disability insurance benefits and supplemental security income. Plaintiff alleges that she became disabled on October 15, 2010, due to fibromyalgia, celiac disease, chronic migraines, tendonitis, carpel tunnel, gastritis, depression, anxiety, neuropathy, and arthritis. Plaintiff's application was denied initially and plaintiff requested an administrative hearing before an Administrative Law Judge (ALJ). ALJ Patricia S. McKay held a hearing on February 22, 2016. Plaintiff was represented by counsel at the hearing. Plaintiff and vocational expert Michael E. Rosko testified.

    Plaintiff testified that she was 43 years old at the time of the hearing, has a high school education, and attended community college. (ECF No. 8-2, PageID.81-82). Plaintiff last attended community college a year before the hearing but left due to difficulties with remembering. (PageID.83). Plaintiff had past work experience as a school bus driver, a laser operator in a machine shop, office manager, realtor, computer operator, caretaker, and as an employee at K-mart. (PageID.83-88). Plaintiff's disability began in October of 2010, due to migraines causing

her to get fired from her bus driver position due to missed work days. (PageID.89). Plaintiff was able to work into 2013. *Id*.

Plaintiff experiences one migraine headache a week which lasts about 24 hours. (PageID.90). Plaintiff experiences neck and back pain due to arthritis. *Id*. She has received cortisone injections. (PageID.91). Plaintiff was diagnosed with fibromyalgia in September of 2010. *Id*. Plaintiff takes pain medications and does a lot of stretching. (PageID.92). Plaintiff also is being treated for anxiety and depression with Lexapro and Gabapentin. *Id*. Plaintiff had bilateral carpal tunnel release in both wrist, but experiences numbness from her fingertips to her right elbow. Dr. VanLaanen believes that her ulnar nerve is causing numbness. (PageID.92-93).

Plaintiff states that her most troubling issues are her memory, pain, numbness and tingling in her hands, restless legs, and insomnia. (PageID.93). After she wakes up in the morning, plaintiff takes her medication and then waits one or two hours before she can do anything, except for stretching to "work out all the kinks." *Id*. She then tries to get something done around the house such as washing dishes and folding laundry or she drives to the doctor or to get prescriptions. (PageID.94). She is able to take care of hygiene most of time, but sometimes needs help getting out of bed or the bathtub. *Id*. Her boyfriend and daughter do most of the cooking. (PageID.95). She does some reading, plays cards, and games such as rummy or cribbage. *Id*. She takes Norco and Baclofen for pain which makes her feel stupid and in a haze. (PageID.95-96). Plaintiff smokes about a pack of cigarettes a day. (PageID.96). She does not need to use a walker, but she needs to stand about fifteen minutes after sitting. (PageID.96-97). Plaintiff states that she used to be active, but she has been going downhill. She cannot sit or stand for long, gets depressed, gets migraines, has insomnia, and is not reliable. (PageID.97). Plaintiff attributes her memory issues

to fibro fog. (PageID.100). Plaintiff has difficulty with buttons and zippers and difficulty typing on a computer. (PageID.101-102).

The vocational expert testified at the hearing that an individual who could occasionally climb stairs, crouch, crawl, kneel, stoop, or bend, not work near hazardous machinery or unprotected heights, could not climb ladders, ropes, or scaffolding, could occasionally grasp, and frequently use fingers, have limited contact with co-workers, supervisors, or the public, and perform simple routine work that was self-paced would not be able to find a job at the light or sedentary exertional levels due to the limitations on grasping and contact with the public. (PageID.104-105). If that same individual could frequently grasp there would be jobs available at the light level such as mail sorter (1,500 jobs in Michigan and 60,000 jobs nationally), assembly (6,000 jobs in Michigan and 50,000 jobs nationally), packaging (4,000 jobs in Michigan and 50,000 jobs nationally), and sorting (3,000 jobs in Michigan and 50,000 nationally). (PageID.107-108). Sedentary jobs available would include assembly jobs (18,000 jobs nationally), product processing or product finishing (700 jobs in Michigan, and 11,000 jobs nationally), sorting (400 jobs in Michigan, and 7,500 jobs nationally), and document scanning (200 jobs in Michigan, and 5,000 jobs nationally). (PageID.108). There are light duty jobs that only involve occasional grasping, such as attendant jobs like arcade attendant, movie theater usher, and parking lot attendant, with at least 50,000 jobs available. (PageID.109). At the sedentary level there are jobs such as security monitoring, gate attendant, and lobby attendant (800 jobs in Michigan, and 25,000 jobs nationally). (PageID.109-110). If the individual was allowed to change from a sitting to standing position, the security work would be unaffected, but the other jobs at the sedentary level would be limited by up to twenty percent. (PageID.110). At the light duty level, the jobs would be eliminated. (PageID.111). An individual who is off-task twenty five percent of the workday is

3

not employable. (PageID.112). An individual who is off-task ten percent of the day will have a difficult time keeping up. *Id*. Missing work two days per month will make an individual unable to hold a job. *Id*. The vocational expert stated that based upon the testimony from the hearing he could "place [plaintiff] into some jobs" but he could not state whether "she would hold them very long due to the problems she's experienced with pain and difficulty staying focused." (PageID.113).

On October 15, 2010, Dr. Ellen VanLaanen prescribed Cipro and Vicodin for Plaintiff's complaints of headaches and a cough. (ECF No. 8-7, PageID.421). Plaintiff saw Dr. VanLaanen, again on October 25, 2010, after a hospital visit during which she received a normal CT scan. (PageID.420). Plaintiff continued to complain of dizziness and headache pain. *Id*. Dr. VanLaanen assessed Plaintiff with sinusitis, migraine headaches, and fibromyalgia.

On December 16, 2010, an MRI showed mild degenerative disc space disease more pronounced at C4-C5 and C5-C6 levels, broad based mild disc annular bulges at C3-C4 through C6-C7 resulting in mild narrowing of the ventral CSF space, and a left paracentral very small focal disc protrusion at C5-C6 level abutting the ventral aspect of the cord. (PageID.387). An MRA of plaintiff's brain was normal. (PageID.388-389).

Dr. Pratap Gupta examined plaintiff on December 16, 2010, noting that plaintiff's headaches were much worse without the use of Topamax and that Topamax was effective in reducing Plaintiff's migraine headaches. Plaintiff was encouraged to continue to use Topamax. (PageID.395). In addition, Dr. Gupta prescribed Corgard, and intended to follow-up on plaintiff's complaints of numbness and tingling in her hands. *Id*.

In April of 2011, plaintiff began complaining about a sudden onset of back pain. (PageID.441). Dr. VanLaanen prescribed Cymbalta for plaintiff's fibromyalgia on June 15, 2011. (PageID.440). On July 13, 2011, after "having a horrible time with her fibromyalgia, migraines, and multiple other problems" she was doing much better on Cymbalta. (PageID.437). Plaintiff was examined by Dr. VanLaanen on August 10, 2011. (PageID.435-436). At that time, plaintiff's fibromyalgia was stable, but her arms were still very painful. Plaintiff had been receiving a series of injections which helped her. She experienced fewer headaches while taking Lupron. On March 12, 2012, Dr. VanLaanen performed a preemployment physical for plaintiff for a job working with special needs children. (PageID.432-433). In May of 2012, plaintiff presented with complaints of fibromyalgia and depression. (PageID.431). Dr. VanLaanen prescribed Citalopram, while plaintiff tapered off Cymbalta because of the side-effects, and Mobic. (PageID.432).

Plaintiff visited Dr. Gupta on July 19, 2012. (PageID.474). Plaintiff developed restless leg syndrome, joint and muscle pain, and swelling around the shoulder area. She also had anxiety and depression resulting from her leg symptoms. Plaintiff's headaches had improved. Dr. Gupta ordered Requip to treat restless leg syndrome and provided trigger point injections to treat diffuse fibromyalgia in the shoulder area. (PageID.475). On September 5, 2012, plaintiff saw Dr. Jasmine Joseph for an evaluation of her diffuse arthralgias and myalgias. Dr. Joseph concluded that plaintiff had "features of fibromyalgia" with her underlying depression playing a role in her chronic pain symptoms. Dr. Joseph recommended that plaintiff begin an exercise program and to follow-up with Dr. VanLaanen to manage her depression.

Dr. VanLaanen saw plaintiff on October 23, 2013, for numbness in her face and increased fibromyalgia pain (PageID.410), and for fibromyalgia pain and sinus pressure on

November 26, 2013. (PageID.409). Dr. VanLaanen prescribed gabapentin. In December of 2013, plaintiff was instructed to increase her usage of gabapentin. (PageID.408).

On March 19, 2014, Dr. VanLaanen saw plaintiff for severe anxiety. (PageID.549). Dr. VanLaanen noted that plaintiff had filed a disability claim and that she would not perform a functional capacity exam, but would refer plaintiff to her physical therapist to make determinations as to what plaintiff can or cannot do. *Id*. On April 9, 2014, plaintiff presented a form (RFC questionnaire) for Dr. VanLaanen, who went over each item with plaintiff. (PageID.550). Dr. VanLaanen noted that plaintiff was depressed and lost jobs for missing too many days due to fatigue and pain. Dr. VanLaanen completed the RFC questionnaire. (ECF No. 8-7, PageID.512-513). Dr. VanLaanen has treated plaintiff regularly since 2008 and diagnosed plaintiff with depression and fibromyalgia with constant pain. She indicated that plaintiff would need to lie down or recline during the workday, could walk less than one block, sit for no more than ten minutes, and stand or walk no more than 15 minutes. During an eight-hour day, plaintiff could sit for two hours and stand for two hours. Plaintiff would need five-minute break, every fifteen minutes. Plaintiff could occasionally lift less than ten pounds and could use her hands five-percent of an eight-hour day, could not use her fingers to manipulate, and could reach with her arms one percent of an eight-hour day. Plaintiff would be absent from work more than four days per month and is not physically capable of working.

Plaintiff began having back problems after she bent over to pick something up. (PageId.551). Dr. VanLaanen diagnosed her with a lumbosacral strain. An MRI disclosed an annular tear disc degeneration at L5-S1 with a tiny central disc protrusion. (ECF No. 8-8, PageID.569). Plaintiff sustained a shoulder injury in October of 2014. (ECF No. 8-7,

PageID.543). Plaintiff went to physical therapy to increase mobility and flexibility and to strengthen her rotator cuff and joint. (ECF No. 8-7, ECF No.515-527).

On January 6, 2015, Dr. VanLaanen examined plaintiff noting that she complained of pain due to fibromyalgia with good and bad days. Plaintiff takes Neurontin and hydrocodone/ acetaminophen as needed. (ECF No. 8-8, PageID.553-554). Plaintiff complained of hand numbness, fibromyalgia, and muscle spasms. (PageID.556). Plaintiff experienced muscle spasms in her back. She tried Flexerill, which made her sleepy. Dr. VanLaanen prescribed baclofen. On July 8, 2015, plaintiff was diagnosed with bilateral carpel tunnel syndrome. On July 21, 2015, plaintiff underwent a right carpel tunnel release and, on September 29, 2015, she underwent a left carpel tunnel release. (PageID.540-541, PageID.530-533).

Plaintiff had a consultative examination with psychologist Dr. Gary Kilpela. (ECF No. 8-7, PageID.504-507). Plaintiff reported that she had fibromyalgia, celiac disease, migraines, carpel tunnel, tendonitis, gastritis, neuropathy, and arthritis. Dr. Kilpela found that plaintiff's prognosis was fair to guarded and that she would be restricted in the type of work that she could perform and may have difficulty with a full-time schedule. Dr. Kilpela felt that plaintiff's goal of working in a medical office within the next five years was reasonable. Dr. Kilpela diagnosed plaintiff with dysthymic disorder, generalized anxiety disorder, and with problems with social functioning. He gave her a Global Assessment Functioning score of 55.

Dr. Kilpila found that plaintiff had marked limitation in her ability to understand and remember detailed instructions with poor short-term memory. (PageID.508). She had extreme limitations in carrying out detailed instructions, maintaining attention and concentration, performing scheduled activities, maintaining regular attendance, and to be punctual within customary tolerances. She maintained the ability to carry out very short and simple instructions

7

and the ability to sustain an ordinary routine without supervision. *Id*. She has marked limitations on the ability to complete a normal workday without psychological based symptoms, and extreme limitations to perform at a consistent pace with normal rest periods. (PageID.509). She has slight to moderate limitations with social interaction. *Id*. She has marked limitation in setting realistic goals. (PageID.510).

The ALJ found that plaintiff could perform jobs that existed in significant numbers in the national economy given plaintiff's residual functional capacity (RFC) and therefore concluded that plaintiff was not under a "disability" under the Social Security Act (20 C.F.R. § 404.1520(g)). The ALJ's decision became the agency's final decision when the Appeals Council denied plaintiff's request for review. Plaintiff now seeks judicial review of the agency's final decision denying her request for disability benefits.[1]

"[R]eview of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Winslow v. Comm'r of Soc. Sec.*, 566 Fed. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see also* 42 U.S.C. § 405(g). The findings of the ALJ are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y, Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This Court is not permitted to try the case *de novo*, nor resolve conflicts in the evidence and cannot decide questions of credibility. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (noting the ALJ's decision cannot be

---

[1] Both parties consented to proceed before a Magistrate Judge.

overturned if sufficient evidence supports the decision regardless of whether evidence also supports a contradictory conclusion). This Court is required to examine the administrative record as a whole and affirm the Commissioner's decision if it is supported by substantial evidence, even if this Court would have decided the matter differently. *See Kinsella v. Schwikers*, 708 F.2d 1058, 1059 (6th Cir. 1983); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (holding that the court must affirm a Commissioner even if substantial evidence would support the opposite conclusion).

The ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act. See 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At step one, the ALJ determines whether the claimant can still perform substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant's impairments are considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to still perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). At step five, after considering the claimant's residual functional capacity, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines plaintiff is not disabled under any step, the analysis ceases and plaintiff is declared as such. 20 C.F.R § 404.1520(a). If the ALJ can make a dispositive finding at any point in the review, no further finding is required. 20 C.F.R. § 404.1520(a).

Plaintiff has the burden of proving the existence and severity of limitations caused by her impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id*.

The ALJ determined that plaintiff has severe impairments of degenerative disc disease of the cervical spine with disc bulges, annular tear disc degeneration at L5-S1 with tiny central disc protrusion, degenerative disc disease of the thoracic spine, psychogenic dizziness and migraine headache phenomenon, fibromyalgia and thyroid disorder with history of anxiety and depression, dysthymic disorder, carpal tunnel syndrome status post bilateral release with early distal and peripheral and interphalangeal joint osteoarthritis of the left hand, obesity, and planter fasciitis with right heel spur. (ECF No. 8-2, PageID.46). The ALJ explained:

> In terms of the claimant's physical impairments, the evidence generally does not support the alleged loss of functioning. As discussed above, the claimant continued to work years after the alleged onset date. She worked as a caregiver at Evergreen from September 2013 to March 2014, then as a cashier at K-Mart from August 2014 to December 2014 and only stopped working after it went out of business (Hearing testimony). Even though she said she stressed she worked fewer hours than co-workers and stopped because of her back pain, she worked at levels that approached substantial gainful activity in the second and third quarters of 2013 (Exhibits 3E; IE/4). Although she testified she has difficulty performing certain activities of daily living, she also indicated she is able to drive, clean, cook with breaks, go out alone, type on a computer, and play cards and games with others (Exhibit 6E/2, 4).
>
> The medical evidence of record also does not support her allegations of disabling impairments. For instance, although she testified she became disabled on October 15, 2010 because of headaches, diagnostic scans and tests consistently showed normal findings (Exhibits 1F/6-11; 13F/61). She sought treatment for headaches on

the alleged onset date and was hospitalized for headaches shortly thereafter (Exhibit 13F/16, 76). She received treatment from Barry D. Johnson, M.D., for a brief period but left the hospital, stating she did not want medicine, leading Dr. Johnson to discharge her from his care (Exhibit 13F/71-73). She went to see another neurologist, Pratap C. Gupta, M.D., who said she was getting better and had more energy even though she had not sought treatment from him in over a year (Exhibits 1F/12, 16; 3F/12). The claimant told consultative examiner Dr. Kilpela in March 2014 that she has migraines once or twice a week with pain of a 8 or 9 on a scale often, she had not sought treatment [for] headaches since July 2012, when Dr. Gupta noted her headaches had improved after her stress had decreased (Exhibits 3F/69, 87; SF/I). However, the undersigned included the limitations described above regarding avoiding hazards, moving machinery, unprotected heights, ladders, ropes, and scaffolds to accommodate any limitations this condition may cause. While the claimant alleged light causes migraines, the undersigned did not include a corresponding limitation in the residual functional capacity because such a limitation is not extensively documented in the medical evidence of record (Exhibit 22E/l).

Imaging studies establish the claimant has minor degenerative changes in her cervical, lumbar, and thoracic spine, as described above (Exhibits 1F/5; llF/22; 14F/2, 4). However, physical examinations of her spine typically yielded normal findings, with only occasional tenderness to palpation (Exhibits 1F/13; 3F/8, 13, 37; 4F/4; 1lF/8; 13F/4). She told her chiropractor that her back and neck pain are aggravated when she bends, lifts, and stands for a prolonged period of time, is under stress, and moves in certain directions, though she also indicated it was relieved with adjustments, ice, stretching, and Biofreeze (Exhibit 12F/2, 8, 15, 32). In fact, as recently as January 2016, she rated her back and neck pain as only a two on a scale often (Exhibit 12F/2). The claimant has also been diagnosed with plantar fasciitis with a small heel spur but has not sought extensive treatment for this condition (Exhibits 3F/38, 48, 70; 13F/85, 95).

The claimant's fibromyalgia diagnosis did not meet all of the requirements of SSR 13-2p, as there is no evidence other disorders were ruled out or that the diagnosing physician conducted a thorough review of the claimant's medical records. Nonetheless, the undersigned considered it in the residual functional capacity described above because doctors have found tender points throughout her body (Exhibit 3F/36, 38, 46, 84, 87). However, physicians have noted her fibromyalgia symptoms and mood improved significantly with conservative treatment such as

medication, pool therapy, and trigger point injections (Exhibit 3F/3, 10-11, 30, 32). In January 2015, treating physician Ellen Vanlaanen, D.O., determined her fibromyalgia is "moderately well-controlled" (Exhibit llF/7). The undersigned also recognizes the claimant has been diagnosed with hypothyroidism but notes physical examinations typically revealed her thyroid was not palpably enlarged even though physicians documented thyroid medication noncompliance (Exhibits 3F/4-6, 75; llF/14; 13F/l 1).

As mentioned above, the claimant also has a history of obesity. However, the claimant was able to walk with a normal gait (Exhibits lF/13; 3F/70). She has also reported her interests included rock hunting and swimming, both of which are physically demanding activities (Exhibit 5F/2). While the claimant stood up several times during the hearing, consultative examiner Dr. Kilpela also observed she ambulated slowly but appeared to be fairly comfortable in a seated position although she hardly moved at all while seated during the entire examination (Exhibit 5F/3). As such, while the claimant's obesity could be expected to exacerbate symptoms such as back and extremity pain, the undersigned finds the combined effects of the claimant's impairments, including obesity, would not preclude her from performing work at the sedentary exertional level to the extent described in this decision.

The undersigned also included manipulative limitations in the claimant's residual functional capacity because she has had carpal tunnel release surgery of both hands (Exhibit 8F/2-5). Diagnostic scans of her left hand showed early DIP and PIP joint osteoarthritis (Exhibit 14F/3). As noted above, however, she testified she was able to play cards and type on a computer, which involves significant amounts of fingering and grasping.

The record also establishes the claimant is capable of simple, routine work that is low stress. While doctors occasionally noted her affect and mood were depressed and blunted, medical records also revealed she was attending school to become a medical office specialist (Exhibits 9F/9; llF/7). Medical professionals also noted her symptoms improved on medication and that she was a decent historian with an adequate attention span (Exhibit 5F/3).

(ECF No. 8-2, PageID.51-52).

The ALJ found that plaintiff has the RFC to perform sedentary work with limitations:

> she can only occasionally climb stairs, crouch, crawl, kneel, stoop, or bend. She is unable to work near hazards such as moving machinery or working at unprotected heights. She cannot climb ladders, ropes, or scaffolding. With her upper extremities, she can occasionally use them for grasping. She can frequently use her upper extremities for fingering. She is limited to work that is simple and routine in nature. She is also limited to work that is self-paced as opposed to a production rate.

(PageID.50). The ALJ determined that plaintiff could not perform past relevant work as a bus driver or caregiver, but had the RFC to perform work such as a gate attendant, lobby attendant, and security attendant. (PageID.54-56).

Plaintiff argues that the ALJ erred in determining her RFC by failing to give Dr. VanLaanen's opinion controlling weight, failing to give Dr. Kilpela's opinion significant weight, and by "cherry picking" the medical evidence to support her finding. The ALJ stated:

> On April 9, 2014, Dr. Vanlaanen opined the claimant is limited to lifting less than ten pounds, very little sitting and standing, requires a sit/stand option, has limitations on grasping and reaching, and is not able to manipulate (Exhibits 6F; 10F). These opinions are not given controlling weight because her treatment records and the claimant's Function Report do not support them. Additionally, in treatment records from the same date, Dr. Vanlaanen indicated they "went over each item in the form," which suggests her opinion was based on the claimant's self-reports (Exhibit l lF/3).
>
> On October 23, 2013, Dr. Vanlaanen indicated the claimant could return to work on October 28, 2013 (Exhibit 3F/80). The undersigned gives this statement little weight because whether the claimant is able to work is a matter reserved for the Commissioner. Furthermore, she did not support this statement with rationale, clinical findings, or objective evidence.
>
> The undersigned has considered Dr. Kilpela's opinion that the claimant may have difficulty with an ongoing full-time schedule (Exhibit SF/4). He also opined the claimant is capable of short, simple instructions and has only slight limitations with regard to

> working in close proximity to others or social interaction (Exhibit SF/5-7). The undersigned does not give this opinion great weight because he only met with the claimant once, indicating his opinion does not represent a longitudinal assessment of the claimant's capabilities. Moreover, the record indicates the claimant does not have significant social limitations, as she plays cards with others and socializes with family on a regular basis, as discussed above.

(PageID.53).

Plaintiff argues that the RFC determination is not supported by medical opinion evidence. Plaintiff states that nothing in the medical record supports the ALJ's RFC determination. In determining a person's RFC, an ALJ should assess the person's "ability to do sustained work-related physical and mental activities in a work setting" for eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8p. An impairment is severe for purposes of an RFC determination when it is a "'medically determinable' physical or mental impairment or a combination of impairments that significantly limit(s) an individual's physical or mental ability to perform basic work activities." *White v. Colvin*, No. 14-CV-12870, 2015 WL 5210243, at *6 (E.D. Mich. Sept. 3, 2015) (citing 20 C.F.R. §§ 416.920(a)(4)(ii) and 416.920(c)). The regulations state that basic work activities include:

> 1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handline; 2) capacities for seeing, hearing, and speaking; 3) understanding, carrying out, and remembering simple instructions; 4) use of judgment; 5) responding appropriately to supervision, co-workers, and usual work situations; and 6) dealing with changes in a routine work setting.

*White*, 2015 WL 5210243, at *6 (citing 20 C.F.R. § 416.921(b)). Notably, an RFC is not the least a person can do, but the most a person can do despite his limitations or restrictions. SSR 96-8p. Plaintiff bears the burden of providing the medical evidence showing the severity of her conditions. *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

In making an RFC finding, "[i]t is well established that the ALJ may not substitute his medical judgment for that of the claimant's physicians." *Brown v. Comm'r of Soc. Sec.*, No. 1:14-cv-236, 2015 WL 1431521, *7 (W.D. Mich. Mar. 27, 2015) (citing *Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006)); *see Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). However, the ALJ is not required to base his or her RFC findings entirely on a physician's opinion. *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x 719, 728 (6th Cir. 2013) (quoting SSR-96-5p) ("[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."). Ultimately, the ALJ may base her RFC finding on *all* relevant evidence on record, including an individual's medical history, reports of daily activity, and recorded observations, for example. SSR 96-8p, 1996 WL 374184, at *5. The "ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and nonmedical evidence." *Rudd*, 531 Fed. App'x at 728.

Plaintiff argues that the ALJ failed to afford proper weight to the opinions of treating physicians Dr. VanLaanen and Dr. Kilpela. Under the regulations, an ALJ must weigh all medical opinions regardless of its source. 20 C.F.R. § 1527(c). The following factors should be considered when determining what weight to afford a medical opinion: "the length of the treatment

relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 1527(c)).

An ALJ affords a treating physician's opinion controlling weight when the evidence and findings are consistent with the other substantial evidence on record. 20 C.F.R. § 1527(c)(2); *see Miller v. Comm'r of Soc. Sec.,* 815 F.3d 825, 836-837 (6th Cir. 2016) (noting the weight assigned must account for the (in)consistency "among the examining sources and the record as a whole" and also consider the factors under 20 C.F.R. § 1527). Only when the ALJ does not afford great weight to a treating source's opinion is the ALJ required to apply and conduct an analysis of the factors under (c)(2)(i) and (c)(2)(ii), and (c)(3) through (c)(6). *Id.* Moreover, an ALJ is not required to rely on medical opinions concluding that a person is, or is not, disabled since that is an issue reserved to the Commissioner. 20 C.F.R. § 1527(d).

"As a procedural requirement, the ALJ must also provide 'good reasons' for discounting the weight to be given to a treating source's opinion." *Edwards v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 645, 649 (6th Cir. 2016) (citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013)). These reasons must be supported by the evidence and be noted with specificity "to ensure that the rule is applied and to permit meaningful review." *Id.* (citing *Gayheart*, 710 F.3d at 376). "Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion." *Price v. Comm'r of Soc. Sec.*, 342 Fed. Appx 172, 175-176 (6th Cir. 2009) citing *Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 652 (6th Cir. 2006); *Warner v. Comm'r of Soc. Sec.,* 375 F.3d at 391-92*, Martin v. Comm'r of Soc. Sec.,*

170 Fed. Appx. 369, 372-73 (6th Cir. 2006); *Ford v. Comm'r of Soc. Sec.,* 114 Fed. Appx. 194, 197 (6th Cir. 2004).

The ALJ set forth reasons for not giving Dr. VanLaanen's opinion regarding plaintiff's functional capacity controlling weight. The ALJ found that treatment records and plaintiff's Function Report do not support limitations of lifting less than ten pounds, very little sitting and standing, a sit/stand option, and limitations on grasping and reaching with no manipulation. Further, the ALJ found that since plaintiff was present and gave input while Dr. VanLaanen filled out the form, it suggested that the opinion was based upon "claimants self-reports."

Similarly, the ALJ did not give Dr. Kilpela's opinion great weight because, Dr. Kilpela only met the claimant once and his opinion was not a "longitudinal" assessment of plaintiff's capabilities. In addition, the ALJ found that the record did not support a conclusion that plaintiff had significant social limitations because she plays cards with others and socializes with family on a regular basis. The ALJ noted that plaintiff's sister and spouse described plaintiff as active despite her pain. Plaintiff reads, played games on the computer, visited family, and attended Bible study.

The ALJ failed to explain how she determined plaintiff's RFC. Once she discounted Dr. VanLaanen's opinion and the medical record that supported that opinion, the ALJ had nothing left to rely upon in formulating her RFC determination. It was error to completely discount Dr. VanLaanen's opinion. Contrary to the ALJ's conclusion, Dr. VanLaanen's opinion was clearly supported by the medical record and hearing testimony. Further, the fact that Dr. VanLaanen may have completed the form in plaintiff's presence is not dispositive. There exists no reason to believe that Dr. VanLaanen was untruthful. Further, there is no contradictory

17

evidence in the record to conclude that Dr. VanLaanen's opinion is wrong. The ALJ had the option to expand the record and to seek consultative examinations. The ALJ did not make that choice. The ALJ erred by fully discounting the opinion of plaintiff's treating physician without medical evidence or opinion evidence that could support a contrary conclusion. The RFC determination was made without medical evidentiary support. The Court is left with no reason to believe the accuracy of the RFC determination because it was made without regard to the medical record evidence. There is not substantial evidence in the record to support the findings of the ALJ.

Accordingly, the decision of the Commissioner is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this Opinion. The Commissioner is in the best position to review the record and determine whether or not plaintiff is entitled to benefits under the circumstances presented.

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: August 23, 2018